UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Ahmed Hassan,                                    File No. 23-cv-1470 (ECT/DLM)

       Plaintiff,

v.                                               **OPINION AND ORDER**

Amazon.com Services, LLC,

       Defendant.

---

David J.S. Madgett, Madgett Law, LLC, Minneapolis, MN, for Plaintiff Ahmed Hassan.

Jason Joseph Ranjo, August W. Heckman III, Morgan, Lewis & Bockius LLP, Princeton, NJ, and Jonathan P. Norrie, Bradford Andresen Norrie & Camarotto, Bloomington, MN, for Defendant Amazon.com Services, LLC.

---

Plaintiff Ahmed Hassan worked for Defendant Amazon.com Services, LLC, until the company fired him for committing expense fraud.  In this case, Mr. Hassan claims Amazon's decision to terminate his employment, its earlier failures to promote him, and other adverse actions he suffered during his Amazon employment, all resulted from national-origin, race, and color discrimination, and occurred in retaliation for his exercise of protected activities.

Amazon seeks summary judgment, and the motion will be granted.  Procedural issues—like waiver, for example—justify the entry of summary judgment against several of Mr. Hassan's theories.  Procedural issues aside, Mr. Hassan's claims fail on their merits.  He has not identified trial-worthy evidence of discrimination or retaliation.

I[1]

*Between 2015 and 2021, Mr. Hassan worked his way up at Amazon from a warehouse position to a corporate "academy instructor" position.* Mr. Hassan began working for Amazon as a warehouse associate on August 3, 2015. ECF No. 75-1 at 16–17. After working in that role a short time, Mr. Hassan applied and was hired for a different Amazon position that involved warehouse-associate management and order fulfillment, among other responsibilities. *Id.* at 19–20. Mr. Hassan worked in this position for roughly three years. *Id.* at 19. After that, Amazon hired Mr. Hassan as a driver-resource manager. *Id.* In this position, Mr. Hassan managed "the delivery companies that Amazon partners with," which he described as "those blue van companies that deliver your packages." *Id.* Mr. Hassan worked in this position for roughly two years. *Id.* at 20. Beginning February 2021, Amazon employed Mr. Hassan as "academy instructor." *Id.* at 21, 23. The record includes no position description or similar document describing an academy instructor's duties, but some of the position's core responsibilities can be drawn or inferred from record evidence. Academy instructors work remotely, leading virtual classes for newly promoted or newly hired managers regarding Amazon's policies and procedures, among other subjects. *Id.* at 23. Academy instructors are expected to remain available by email, phone, or internal messaging systems during working hours. *See* ECF No. 92-2 at 17.

---

[1]    Unless otherwise noted, the following facts are undisputed or described in a light most favorable to Mr. Hassan. *See* Fed. R. Civ. P. 56(a). Page cites are to a document's CM/ECF-assigned pagination appearing in the document's upper right corner, not to a document's original pagination.

*Around April or May 2021, Mr. Hassan's then-direct manager posed questions and said things to Mr. Hassan regarding Mr. Hassan's national origin and Muslim faith.* See ECF No. 75-1 at 38–49. Beginning April 27, 2021, Mr. Hassan's direct manager was Derek Kling. ECF No. 72 ¶ 2. Around late April or May, Mr. Kling asked Mr. Hassan where he was from. ECF No. 75-1 at 41. After Mr. Hassan answered he was from Somalia, Mr. Kling asked: "Oh, is that the place with the pirates and whatnot?" *Id.* at 41–42. Mr. Kling also asked about Mr. Hassan's religious practice of fasting. *Id.* at 39–41. Mr. Kling asked Mr. Hassan whether he fasted; when Mr. Hassan answered that he did, Mr. Kling said, "I don't like that." *Id.* at 39. In his deposition, Mr. Hassan clarified he understood Mr. Kling to mean that he (Mr. Kling) would not like to fast. *Id.* at 42. Mr. Kling asked questions regarding Mr. Hassan's ability to perform his position during periods he was fasting. *See id.* at 42 ("Are you still able to do your job?"); *id.* at 43 ("How are you able to do your job?"); *id.* ("Are you able to focus throughout the day? Do I have to worry about you?"). And Mr. Kling called fasting "stupid." *Id.* at 46.

*Amazon maintains a process for promotion decisions.* "The promotion process at Amazon starts when a manager identifies a direct report as potentially ready for a promotion." ECF No. 77 ¶ 9. The manager prepares a "promotion document" that incorporates comments from various stakeholders regarding the employee's performance and describes "pros and cons for the promotion." *Id.* ¶ 10. Promotion decisions are informed by group discussion. Managers and human-resources personnel meet to discuss an employee's promotion readiness. *Id.* ¶ 11. If the group reaches consensus that an employee is promotion-worthy, "the employee's manager submits the promotion

document for approval by the employee's skip-level manager—i.e., the direct manager of the employee's direct manager." *Id.* Amazon requires managers to enter "a potential promotion date" in an internal system. *Id.* ¶ 12. This procedure enables a manager to plan "to ensure that an employee's promotion document is complete" prior to the meeting at which an employee's promotion-worthiness is considered. *Id.* A manager's decision to enter a potential-promotion date in Amazon's system for a particular employee does not guarantee the employee will be promoted. *Id.* ¶ 13. Employees do not have access to view their potential-promotion dates, and managers are not supposed to share those dates with employees. *Id.*

*Mr. Hassan believes he should have been promoted during the first quarter of 2022.* In June 2021, Mr. Kling told Mr. Hassan that Mr. Hassan's expected-promotion date was during the first quarter of 2022. ECF No. 75-1 at 33, 49–50. Mr. Hassan knew this expected-promotion date was "not a firm promotion date." *Id.* at 34. Mr. Hassan described it as a "goal date." *Id.* at 50. Mr. Kling and Mr. Hassan worked to prepare Mr. Hassan's promotion document starting in June or July 2021. *See id.* at 67; ECF No. 75-4 at 1. It took Mr. Hassan "a couple of months" to complete his portion of the document. ECF No. 75-4 at 1. Beginning December 22, 2021, Mr. Hassan reported to a new direct manager, Jake Sanchez, who replaced Mr. Kling. ECF No. 72 ¶ 3. In early February 2022, Mr. Hassan sent the promotion document to Mr. Sanchez. ECF No. 75-4 at 1; *see* ECF No. 72 ¶ 3. Mr. Sanchez, however, told Mr. Hassan that he did not see Mr. Hassan

as a Quarter 1 2022 promotion candidate.[2]  ECF No. 75-1 at 67.  In a call with Ms. Alvarez on February 9, 2022, Mr. Hassan expressed concerns regarding his non-promotion.  *See* ECF No. 75-4.  Ms. Alvarez encouraged Mr. Hassan to continue to pursue a promotion, explaining:

> I can't promise you anything, but do I see you promoting this year?  Yes, I really can't say more than that but based on your metrics, based on how you did last year, based on what you've been doing in the prep score scene, I do think that that will be happening this year, but I can't really tell you anything more than that.

*Id.* at 3.  Both Mr. Sanchez and Ms. Alvarez encouraged Mr. Hassan to continue to push for a promotion.  ECF No 75-1 at 55.  Mr. Hassan "was still hoping to get promoted" after Quarter 1 2022.  *Id.* at 54.  In early March 2022, Mr. Sanchez was working on Mr. Hassan's promotion document but acknowledged the document was "[n]ot even close at the moment."  ECF No. 90-2.

*Mr. Hassan complained to Ms. Alvarez that he had not been promoted to senior academy instructor because of his national origin and other protected characteristics.*  Mr. Hassan complained to Ms. Alvarez "sometime in March" 2022.[3]  ECF No. 75-1 at

---

[2]     Mr. Hassan's expected-promotion dates were pushed back between March 2021 and July 2022.  *See* ECF No. 72-2 at 2–4.  In a call with Ms. Alvarez, Mr. Hassan described one of these moves—that pushed his expected-promotion date from Quarter 4 2021 to Quarter 1 2022—in indifferent terms, saying that "stuff happened" and "it doesn't matter."  ECF No. 75-4 at 1.

[3]     During his deposition, Mr. Hassan gave conflicting testimony about whether he reported Mr. Kling's comments to anyone at Amazon.  Mr. Hassan first testified that he did not report Mr. Kling's comments.  In response to being asked whether he "ever report[ed] the comments Mr. Kling made to anyone," Mr. Hassan testified: "No.  I kind of gave him the benefit of the doubt.  I did not.  In hindsight I should have, but I did not."

68. Mr. Hassan told Ms. Alvarez about Mr. Kling's questions and comments (from April or May 2021) regarding Mr. Hassan's national origin and religious practice of fasting. *Id.* at 73–76. And Mr. Hassan claimed his non-promotion "ha[d] something to do with that." *Id.* at 73; *see also id.* at 76. Prior to his call with Ms. Alvarez, Mr. Hassan used an Amazon directory to identify at least thirteen employees who Mr. Hassan "worked with directly or indirectly over the years," *id.* at 58, who had been "fast tracked" and "were getting promotions," and who Mr. Hassan "assum[ed]" were "White American," *id.* at 63. Mr. Hassan told Ms. Alvarez he believed the fact that these employees had been promoted while he had not showed discrimination. *See id.* at 74 ("I see that there's certain employees that are of a certain race that are being fast tracked. They have no issue going forward, and here I am, because I'm an anomaly. That's what I told her pretty much."); *see also id.* at 76. Ms. Alvarez told Mr. Hassan she was not able to help him. *Id.* at 76–77. Mr. Hassan believed Ms. Alvarez was "indifferent" to his complaints and did not take them seriously.[4] *Id.* at 77. Regardless, Mr. Hassan testified during his

---

ECF No. 75-1 at 49. Later in the deposition, however, Mr. Hassan testified that he told Mr. Kling's direct supervisor, Alyssa Alvarez, in March 2022 about Mr. Kling's comments. *Id.* at 75–76. This order accepts as true Mr. Hassan's testimony that he reported Mr. Kling's comments to Mr. Alvarez.

[4]    In his deposition, Mr. Hassan first testified that he also complained to Mr. Sanchez. ECF No. 75-1 at 66–67. When asked about the content of his conversation with Mr. Sanchez, however, Mr. Hassan could not recall a specific conversation and asserted only that Mr. Sanchez must have been "aware" of Mr. Hassan's complaints "because managers, they share things, especially if you go a skip level. They'll definitely tell your direct manager." *Id.* at 78.

deposition that "no one else" other than Mr. Kling discriminated against him.  *Id.* at 78–79.

*Mr. Hassan took a medical leave from May 23 to June 13, 2022, and assertedly poor communication regarding his return date prompted Mr. Sanchez to issue a written warning, or "Memorandum of Expectations."*   On May 20, Mr. Hassan notified Mr. Sanchez that he would be taking leave beginning within the week.  *See* ECF No. 75-1 at 95; ECF No. 92-2 at 20.  Mr. Hassan was considering back surgery, though he was undecided about it.  ECF No. 75-1 at 89–90; 94.  Mr. Hassan canceled his leave on June 10 (without undergoing surgery) and returned to work on June 13.  *Id.* at 98–99.  Mr. Sanchez learned of Mr. Hassan's decision to return to work over the weekend between June 10 and June 13.  ECF No. 92-2 at 20.  Mr. Sanchez contacted Mr. Hassan regarding the status of his leave on Monday, June 13.  *Id.*  Mr. Hassan responded the next day, explaining that he had decided to "postpone [his] treatment plan to a later date."  *Id.*  Mr. Sanchez issued a written warning to Mr. Hassan on June 21.  ECF No. 75-1 at 134.  The warning described "a pattern of poor communication starting in May 2022 which needs to be corrected immediately."  *Id.*  Mr. Sanchez explained that Mr. Hassan's lack of communication over his medical leave was "not in line with Amazon's Leadership Principles."  *Id.*  That same day, Mr. Hassan emailed Learning & Development Director Levi Ray and Talent & Development Senior Manager Elise Mudd, complaining that he viewed the written warning as retaliatory.  ECF No. 75-1 at 136.  Mr. Hassan wrote, "I am being retaliated against by my manager (Jake Sanchez) and being written up for something that is outside of policy."  *Id.*  Mr. Hassan claimed he had violated no policy

and expressed frustration that his managers could not identify a policy violation. *Id.* Mr. Hassan communicated a similar complaint in an email to Learning & Development Director Sage Greising, Vice President John Tagawa, and Operations Director Chris Brumley. ECF No. 75-1 at 135. These communications did not mention or express concerns regarding discrimination based on race, national origin, or religion.[5] *See* ECF No. 75-1 at 135, 136. Regardless, the written warning ultimately was rescinded. ECF No. 75-1 at 138.

*On June 29, 2022, Mr. Hassan filed a charge of discrimination against Amazon with the Equal Employment Opportunity Commission and Minnesota Department of Human Rights.* In the charge, Mr. Hassan claimed to have been subject to discrimination based on a disability, national origin, and race, and that he had been subject to retaliation. ECF No. 75-7 at 6. Mr. Hassan explained the grounds of his charge as follows:

> I. I began working for Respondent in October 2015 and perform [sic] well at my job. During the relevant period I was subjected to different terms and conditions of employment when I was not promoted as discussed, while my partner who is not in my protected class was promoted. I complained and nothing was done to correct the discrimination. In May 2022, I requested a reasonable accommodation which was granted. When my treatment plan changed and I returned to work early, I was disciplined. I complained about retaliation which has not been addressed. II. I believe I have been discriminated against based on race/national origin (Black/Somali), religion (Muslim),

---

[5]    Mr. Hassan also was placed on a performance-improvement plan. ECF No. 95-2 at 8. He was disciplined for "[b]ehavior impacting performance." *Id.* at 10. The only specific incident in the record supporting the plan's implementation is Mr. Hassan's communication regarding his medical leave. *Id.* Mr. Hassan was not aware he was subject to a performance-improvement plan. ECF No. 95-1 at 16.

> disability, and/or in retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act of 1990, as amended.

ECF No. 75-7 at 6.

*On February 9, 2023, Amazon terminated Mr. Hassan's employment for violating Amazon's expense policy.*   In mid-October 2022, Amazon's employee-expense-tracking software flagged Mr. Hassan for purchasing an item in contravention of Amazon's policies.   *See* ECF No. 70 ¶¶ 2–4.   Mr. Hassan purchased Apple AirPods through Amazon's consumer website, expensed them to Amazon, and then returned them for a refund.   *Id.* ¶¶ 2–3; ECF No. 69-1 at 6; *see* ECF No. 95-1 at 12–13.   In addition, Mr. Hassan's purchase and expense of Apple AirPods violated a prohibition in Amazon's expense policy "against expensing noise-canceling headphones."   ECF No. 77 ¶ 17. Separately, Mr. Hassan was flagged for expensing home Internet for more than $50, Amazon's Internet-expense cap for employees working from home.   ECF No. 69-1 at 6. Mr. Hassan testified, however, that he had been told "in an onboarding call" he was able to "expense [his] entire WiFi."   ECF No. 95-1 at 8.   On February 2, 2023, Mr. Hassan was interviewed by Kieran Lewis, a senior risk manager at Amazon tasked with investigating potential expense fraud.   ECF No. 69 ¶ 2; ECF No. 75-1 at 82.   After the meeting, Mr. Lewis completed his investigation and determined that Mr. "Hassan had likely submitted expenses that were outside of the permitted standard."   ECF No. 69-1 at 6.   Mr. Lewis shared his findings with Mr. Sanchez, Ms. Alvarez, and Pamela KimBrough, a human resources manager responsible for supporting the area in which Mr.

Hassan worked. ECF No. 69 ¶ 6. On February 7, 2023, the three decided to terminate Mr. Hassan's employment on the grounds that expensing the AirPods was fraudulent. ECF No. 77 ¶ 16. The decision was communicated to Mr. Hassan, and his employment was terminated effective February 9, 2023. *Id.* ¶ 18; *see* ECF No. 78.

*Mr. Hassan filed this case on May 22, 2023.* Mr. Hassan brought six claims, five of which remain at issue. The five remaining claims can be grouped in two categories. The first category includes claims for discrimination based on race, color, and national origin under Title VII of the Civil Rights Act of 1964, the Minnesota Human Rights Act, and 42 U.S.C. § 1981. ECF No. 20 ¶¶ 70–89 (Counts I and II); *id.* ¶¶ 102–11 (Count V). Discrimination occurred, Mr. Hassan alleges, when Amazon failed to promote him. *See id.* The second category includes retaliation claims under Title VII and the Minnesota Human Rights Act. *Id.* ¶¶ 90–101 (Counts III and IV). Mr. Hassan alleges Amazon "took several adverse actions against [him] because of [his] opposition to" Amazon's failure to promote him and his opposition to Amazon's "ongoing custom, policy, and practice of promoting American-born, Caucasian employees at a much faster rate and more often than Mr. Hassan and members of Mr. Hassan's class." *Id.* ¶¶ 92–93. Amazon's retaliatory actions included "harassment, intimidation, unequal treatment and, ultimately, termination from employment."[6] *Id.* ¶ 93. For relief, Mr. Hassan seeks compensatory and punitive damages, attorneys' fees and costs, and "such other and

---

[6] The sixth claim—for disability discrimination under the Americans with Disabilities Act, *see* ECF No. 20 ¶¶ 112–17—was dismissed with prejudice pursuant to a stipulation. *See* ECF Nos. 35, 40.

further relief as the court deems equitable and just." *Id.* at 18 (following "WHEREFORE" clause).

## II

Amazon's motion is analyzed with the familiar summary judgment standards in mind. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Though the record is viewed "in the light most favorable to [Mr. Hassan] as the non-moving party, . . . this favorable presumption [is not stretched] so far as to consider as evidence statements found only in inadmissible hearsay." *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001). Nor can conclusory statements in depositions or affidavits suffice to withstand summary judgment. *See, e.g.*, *Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003); *Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 686 (8th Cir. 2003); *Berg v. Bruce*, 112 F.3d 322, 327–28 (8th Cir. 1997).

### A

#### 1

Mr. Hassan's race, color, and national-origin discrimination claims under Title VII (Count I), the MHRA (Count II), and § 1981 (Count V)—to the extent they authorize Mr.

Hassan's claims[7]—share the same elements, so they may be analyzed together. *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003); *Turner v. Otis Elevator Co.*, No. 21-cv-00203 (SRN/ECW), 2022 WL 270885, at *11 n.9 (D. Minn. Jan. 28, 2022). "An employer is entitled to summary judgment on an employee's discrimination claim unless the employee (1) presents direct evidence of discrimination, or (2) creates a sufficient inference of discrimination under the *McDonnell Douglas* framework."[8] *Findlator v. Allina Health Clinics*, 960 F.3d 512, 514 (8th Cir. 2020).

a

Mr. Hassan identifies Mr. Kling's statements as direct evidence of discrimination, but they are not.[9] "Direct evidence is evidence of conduct or statements by persons

---

[7]    "Section 1981 does not authorize discrimination claims based on national origin." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1053 (8th Cir. 2011) (citing *Zar v. S.D. Bd. of Exam'rs of Psychologists,* 976 F.2d 459, 467 (8th Cir. 1992)).

[8]    The brief Mr. Hassan filed in opposition to Amazon's summary-judgment motion is problematic in several respects. *See* ECF No. 88. In violation of Rule 56(c)(1)(A), important factual assertions lack record citations. *See* ECF No. 88 at 2–4. The brief cites very few legal authorities; if you leave aside citations to cases concerning just the Rule 56 summary-judgment standard, the brief cites one case and no other legal authorities. *See* ECF No. 88. The brief does not fairly respond to Amazon's arguments or its detailed treatment of the case. *Compare* ECF No. 66, *with* ECF No. 88. And the brief raises or hints at legal theories that are not in Mr. Hassan's operative Amended Complaint. *Hardin v. Wal-Mart Stores, Inc.*, No. CIV-F-08-0617 AWI GSA, 2010 WL 4924772, at *2 (E.D. Cal. Nov. 29, 2010) ("In opposing summary judgment, plaintiffs may not rely on new claims of new theories under a claim that was plead [sic] in the complaint."). For the most part, this decision looks past these issues. When one of these issues poses a dispositive problem, it will be discussed separately and more specifically.

[9]    Mr. Hassan argues that "the stark contrast between [his] treatment and that of his similarly situated white colleagues—who advanced without the same delays or scrutiny," is direct evidence of discrimination. ECF No. 88 at 9. Comparator evidence ordinarily is

12

involved in the decisionmaking process that is sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Kerns v. Cap. Graphics, Inc.*, 178 F.3d 1011, 1017 (8th Cir. 1999).

> Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence.

*Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). A court must examine (1) the speakers of the statements, (2) the context in which the statements were made, and (3) any causal link between an alleged statement and the adverse employment decision. *Wensel v. State Farm Mut. Auto Ins. Co.*, 218 F. Supp. 2d 1047, 1059 (N.D. Iowa 2002). Statements that "reflect[] a discriminatory attitude" may count as direct evidence. *Floyd-Gimon v. Univ. of Ark. for Med. Scis.*, 716 F.3d 1141, 1150 (8th Cir. 2013) (quoting *King v. Hardesty*, 517 F.3d 1049, 1058 (8th Cir. 2008), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043, 1058 app. (8th Cir. 2011) (en banc)). "Direct evidence is distinguished from 'stray remarks in the

---

not characterized as "direct evidence" of discrimination because it requires inferences to connect the evidence to discrimination against the plaintiff. *See Harris v. Int'l Paper Co.*, No. 2:20-cv-573-TFM-N, 2023 WL 11990891, at *12 (S.D. Ala. Mar. 3, 2023) (recognizing that comparator evidence is not direct evidence because "it requires inference"). Mr. Hassan identifies no reason to treat his comparator evidence differently. The evidence will therefore be considered as part of the *McDonnell-Douglas* analysis.

workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.'" *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 878 (8th Cir. 2010) (quoting *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000)). "Direct evidence does not include statements by decisionmakers that are facially and contextually neutral." *Aulick v. Skybridge Ams., Inc.*, 860 F.3d 613, 620 (8th Cir. 2017) (quoting *Torgerson*, 643 F.3d at 1045). Nor does it include statements made years before any adverse action occurred. *See Simmons v. Océ-USA, Inc.*, 174 F.3d 913, 916 (8th Cir. 1999).

No reasonable juror could find that any of Mr. Kling's statements reflect a discriminatory attitude that is relevant to Mr. Hassan's claims. Mr. Kling's statements may be grouped in two categories. In the first are Mr. Kling's question regarding Mr. Hassan's country of origin and his subsequent question about whether Mr. Hassan's country of origin, Somalia, "is . . . the place with the pirates and whatnot." ECF No. 75-1 at 41–42. Without more, no reasonable juror could infer a discriminatory attitude from Mr. Kling's inquiry regarding Mr. Hassan's country of origin. *See Paradoa v. Phila. Hous. Auth.*, 610 F. App'x 163, 166 (3d Cir. 2015); *see also Szewczyk v. City of New York*, No. 17-CV-1884 (MKB), 2020 WL 13890927, at *15 (E.D.N.Y. Mar. 31, 2020). As Judge Smith Camp observed, asking someone where they are from is commonly asked "to ease into conversation and get to know a person." *Ulmer v. Midwest Fitness Sys., Inc.*, No. 8:06CV372, 2007 WL 2003402, at *7 (D. Neb. July 5, 2007). The same goes for Mr. Kling's follow-on question regarding piracy's presence in Somalia. If asking about another's country of origin (without more) does not show a discriminatory

attitude, then it is difficult to understand how asking about a condition or conditions in that country might, especially when the asked-about conditions are widely known or publicized. In the second category are Mr. Kling's questions and statements regarding Mr. Hassan's religious practice of fasting. Never mind Mr. Kling's questions about Mr. Hassan's fasting practices and their effect on Mr. Hassan's ability to work; calling an individual's religious practice "stupid" betrays a discriminatory attitude toward the individual's religion and religious beliefs. The problem is that Mr. Hassan asserts no religion-based discrimination claim in this case. *See* ECF No. 20 ¶¶ 70–89; 102–111. Mr. Hassan does not argue, or explain how or why, statements betraying a discriminatory attitude toward a religion or religious belief might show a discriminatory attitude toward race, color, or national origin. To put the problem another way, Mr. Kling's statements reflect a discriminatory attitude, but not one that bears on Mr. Hassan's claims.

If Mr. Kling's statements reflected a discriminatory attitude in a relevant sense, Mr. Hassan's direct-evidence argument remains unpersuasive because no reasonable juror could find on this record that Mr. Kling was a decisionmaker with respect to Amazon's decisions not to promote Mr. Hassan in the first quarter of 2022 or after, or with respect to the decision to terminate Mr. Hassan's employment. Mr. Kling supervised Mr. Hassan from April 2021 through December 22, 2021. ECF No. 72 ¶¶ 2– 3. Mr. Kling was not Mr. Hassan's direct manager during Quarter 1 2022, ECF No. 72 ¶ 3. That was Mr. Sanchez, *id.*, and as far as the record shows, Mr. Sanchez independently determined Mr. Hassan was not promotion-worthy at that time, *see* ECF No. 75-1 at 67; ECF No. 90-2. In line with this understanding, Mr. Hassan says in his

opposition brief that Mr. Sanchez "orchestrated" Mr. Hassan's "sharp decline" in performance ratings and "resisted efforts by others to promote Mr. Hassan." ECF No. 88 at 4. It is true that Mr. Kling identified an expected-promotion date for Mr. Hassan and graded his performance in other ways when he was Mr. Hassan's direct manager, but Mr. Hassan does not argue that anything Mr. Kling did when he was Mr. Hassan's direct manager had a material or enduring effect on Mr. Hassan's promotion chances after Mr. Sanchez became his direct manager. For example, Mr. Hassan does not argue or cite evidence showing that Mr. Kling's decisions regarding Mr. Hassan's expected-promotion date or other performance indicators were binding on Mr. Sanchez or mattered in Mr. Sanchez's decision not to pursue Mr. Hassan's promotion. Nor does Mr. Hassan argue that Mr. Sanchez lacked the independent ability to recommend his promotion because of Mr. Kling's views and assessments.[10] Mr. Hassan does not argue that Mr. Kling had any impact on promotion decisions made after Quarter 1 2022.[11] And Mr. Hassan nowhere

---

[10]    Mr. Hassan alleges Mr. Kling was Mr. Sanchez's "friend and close associate." ECF No. 88 at 4; ECF No. 89 ¶¶ 4–5. This assertion seems intended to show Mr. Kling's involvement in the decision not to promote Mr. Hassan. It does not. The assertion is difficult to accept because it lacks a supporting record citation. *See* ECF No. 88 at 4. Accepted as true, the assertion requires inferring from their mere friendship that Mr. Kling involved himself in Mr. Sanchez's management of Mr. Hassan. That, in turn, would require speculation. *See Takele v. Mayo Clinic*, 576 F.3d 834, 839 (8th Cir. 2009) (recognizing that evidence offered to show discrimination is not trial-worthy if it "do[es] not suggest discriminatory animus without resorting to speculation"). In other words, this friendship's existence alone would not give a reasonable jury a sufficient basis to determine that Mr. Sanchez did not promote Mr. Hassan based on Mr. Kling's views regarding Mr. Hassan.

[11]    Mr. Hassan argues that Mr. Kling's "comments were made in the context of Amazon's decisions to repeatedly delay Mr. Hassan's promotion." ECF No. 88 at 9. To

alleges—much more identifies evidence tending to show—that Mr. Kling was involved in the decision to terminate Mr. Hassan's employment.  Mr. Hassan's failure to make these arguments or identify record evidence that might support them is significant. Accepting that Mr. Kling's statements show he possessed a relevant discriminatory attitude, it was still Mr. Hassan's burden to show a causal link between Mr. Kling's biased attitude and a decision not to promote him—in Quarter 1 2022 or after—or the decision to terminate his employment.  Mr. Hassan has not carried this burden.

b

Because Mr. Hassan has not identified trial-worthy direct evidence of discrimination, his claims are analyzed under the burden-shifting framework set forth originally in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).[12]  To establish a prima facie case of race, color, or national-origin discrimination, Mr. Hassan must show: (1) he belongs to a protected class; (2) he met Amazon's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.  *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 973–74 (8th Cir. 2012) (citation omitted).[13]  If Mr. Hassan meets this burden, then the

---

support this assertion, the opposition brief cites "Alvarez Tr. 40:20–41:16."  *Id.*  These transcript pages are not in the record.

[12]    Mr. Hassan did not cite or apply the *McDonnell-Douglas* framework in his brief to support his discrimination claims.  *See* ECF No. 88 at 8–10.

[13]    The adverse employment action need only be "some 'disadvantageous' change in an employment term or condition."  *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024).

burden of production shifts to Amazon to articulate a legitimate, nondiscriminatory reason for adverse treatment. *Id.* If Amazon meets that burden, then the ultimate burden falls on Mr. Hassan "to produce evidence sufficient to create a genuine issue of material fact regarding whether [Amazon]'s proffered nondiscriminatory justifications are mere pretext for intentional discrimination." *Torgerson*, 643 F.3d at 1046 (citation omitted). Mr. Hassan "retain[s], at all times, the ultimate burden of proof and persuasion" to show that Amazon discriminated against him. *Id.*

The only evidence Mr. Hassan identifies relevant to the prima facie case's fourth element is his comparator evidence.[14] To survive summary judgment on this disparate-treatment theory, Mr. Hassan must identify at least one other employee who was "similarly situated in all relevant aspects." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000); *Philip v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005). "[I]ndividuals used as comparators 'must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Gilmore v. AT & T*, 319 F.3d 1042, 1046 (8th Cir. 2003) (quoting *Clark*, 218 F.3d at 918). "[V]iolations treated differently need only be of 'comparable seriousness' and not the 'exact same offense.'" *McKey v. U.S. Bank Nat'l Ass'n*, 978 F.3d 594, 600 (8th Cir. 2020) (quoting *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013)). "Where evidence demonstrates that a comparator engaged

---

[14] For the same reasons Mr. Kling's statements are not direct evidence of discrimination, Mr. Hassan cannot rely on the statements to meet *McDonnell Douglas*'s fourth element.

in acts of 'comparable seriousness' but was disciplined differently, a factfinder may decide whether the differential treatment is attributable to discrimination or some other cause." *Ridout*, 716 F.3d at 1085.

Mr. Hassan's comparator evidence does not meet these rules. Mr. Hassan identified one comparator in his opposition brief, an Amazon employee named David Arensman. ECF No. 88 at 3. As support for the proposition that Mr. Arensman "ha[s] a similar performance record as Mr. Hassan," Mr. Hassan's brief cited two pages from Ms. Alvarez's deposition. *See id.* (citing "Alvarez Tr. 40:20–41:16"). The cited pages are not in the record. It would be a mistake to deny summary judgment based on evidence that is not in the record. Regardless, if Ms. Alvarez's deposition testimony supported the conclusion that Mr. Arensman and Mr. Hassan shared "similar performance record[s]," Amazon submitted evidence showing that neither Mr. Kling nor Mr. Sanchez ever managed or supervised Mr. Arensman. *See* ECF No. 77 ¶ 28; ECF No. 78-1. Mr. Hassan did not address this important evidence in his opposition brief, leaving it unrebutted. Mr. Hassan addressed other would-be comparators at a high level of generality. *See* ECF No. 88 at 9 (asserting, without citation to the record, that "the stark contrast between Mr. Hassan's treatment and that of his similarly situated white colleagues—who advanced without the same delays or scrutiny—demonstrates a pattern of disparate treatment."). It seems safe to presume that the colleagues to whom Mr. Hassan referred are the thirteen individuals he identified through the Amazon directory (including Mr. Arensman). *See* ECF No. 75-1 at 58–59, 63, 74. Mr. Hassan did not explain how or why any of the twelve individuals other than Mr. Arensman might have been similarly situated to him in

all relevant respects, and (again) that was his burden.  Regardless, Amazon cited evidence establishing that none of these individuals ever reported to Mr. Kling or Mr. Sanchez, among other differences between them and Mr. Hassan.  ECF No. 77 ¶¶ 21–33.  Mr. Hassan did not respond to this evidence.  Left unrebutted, this evidence is enough to establish beyond any genuine dispute that the individuals Mr. Hassan identified were not similarly situated to him in all relevant respects.  Mr. Hassan has not shown his discrimination claims are submissible under the *McDonnell-Douglas* framework.

2

a

Mr. Hassan's hostile-work-environment discrimination claim fails on procedural grounds and on its merits.  There are two procedural problems.  The first is that the operative Amended Complaint cannot reasonably be construed to assert a hostile-work-environment claim based on race, color, or national origin.  The law generally forbids the consideration of unpleaded theories at summary judgment.  "In opposing summary judgment, plaintiffs may not rely on new claims or new theories under a claim that was plead [sic] in the complaint."  *Hardin v. Wal-Mart Stores, Inc.*, No. CIV–F–08–0617 AWI GSA, 2010 WL 4924772, at *2 (E.D. Cal. Nov. 29, 2010); *see also N. Fork Partners Inv. Holdings, LLC v. Bracken*, No. 20-cv-2444 (LJL), 2023 WL 3871903, at *10 (S.D.N.Y. June 7, 2023) (refusing to consider fraud theory raised in opposing summary judgment that was not in the complaint) (citing *Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538, 549 (D. Conn. 2017) ("[T]he Court may not consider 'unpleaded allegations' in its ruling on a motion for summary judgment."), *aff'd*,

20

915 F.3d 88 (2d Cir. 2019)).   Here, the Amended Complaint includes conclusory allegations in its introductory paragraphs that Mr. Hassan faced a hostile work environment, but in retaliation for Mr. Hassan's protected activities, not on account of his race, color, or national origin.   *See* ECF No. 20 ¶¶ 17, 20, 22.   The pleading does not allege that Mr. Kling's questions and statements created a hostile environment.   *See id.* And a hostile environment is not mentioned as a discriminatory adverse action in any of the pleading's discrimination counts; the only adverse action mentioned in those counts is Amazon's failure to promote Mr. Hassan.   *See id.* ¶¶ 70–89; 102–111.   Because the Amended Complaint alleges no hostile-work-environment claim based on race, color, or national origin, that claim cannot be considered at this stage.

The second procedural problem is that Mr. Hassan waived his opposition to summary judgment against this claim by not addressing it, or Amazon's arguments regarding the theory, in his opposition brief.   A litigant's complete failure to respond to an opposing party's argument is often construed as a waiver.   *See Dorosh v. Minn. Dep't of Hum. Servs.*, No. 23-cv-1144 (ECT/LIB), 2023 WL 6279374, at *9   (D. Minn. Sept. 26, 2023) ("A plaintiff waives its claims by failing to respond to a defendant's arguments on a motion to dismiss."); *Hopper v. BMO Harris Bank, N.A.*, No. 22-cv-1828 (JRT/JFD), 2023 WL 4936160, at *3 (D. Minn. Aug. 2, 2023) ("Failure to respond to arguments in favor of dismissal may constitute waiver and abandonment, justifying dismissal on that basis alone."); *Doe v. Mayorkas*, No. 22-cv-752 (ECT/DTS), 2022 WL 4450272, at *2 (D. Minn. Sept. 23, 2022) (citing *Espey v. Nationstar Mortg., LLC*, No. 13-cv-2979 (ADM/JSM), 2014 WL 2818657, at *11 (D. Minn. June 19, 2014) (collecting

cases)); *Christensen v. PennyMac Loan Servs.*, 988 F. Supp. 2d 1036, 1042 (D. Minn. 2013) ("Plaintiff's failure to respond amounts to a waiver, and on that basis alone, defendants' motion to dismiss should be granted.") (collecting cases); *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734–35 (8th Cir. 2009) (recognizing that a litigant's "failure to oppose a basis for summary judgment constitutes waiver of that argument"); *see also Milligan v. City of Red Oak*, 230 F.3d 355, 360 (8th Cir. 2000) ("But inasmuch as Milligan's brief does not support his assertion with any argument or legal authority, he has waived the issue and we do not address it."). Amazon addressed a hostile-work-environment discrimination claim at some length in its opening brief. *See* ECF No. 66 at 25–32. Mr. Hassan did not discuss this claim in his opposition brief. *See* ECF No. 88. The brief alludes to the idea that Mr. Kling's comments "create[ed] a hostile atmosphere," *id.* at 3, but only once, and the brief does not address Amazon's arguments or explain why the claim should survive summary judgment, *see id.* This is a waiver.

b

These procedural problems aside, Mr. Hassan identified no evidence apart from Mr. Kling's statements that might conceivably be construed to support this claim, but a reasonable jury could not find that Mr. Kling's statements created a hostile work environment. "The same standard governs hostile work environment claims . . . regardless of whether they are brought under § 1981, Title VII, or the MHRA." *Kpou v. Supervalu, Inc.*, 556 F. Supp. 3d 940, 956 (D. Minn. 2021) (first citing *Pye v. Nu Aire Inc.*, 641 F.3d 1011, 1015 n.3 (8th Cir. 2011), and then citing *Eliserio v. USW, Loc. 310*,

398 F.3d 1071, 1076, 1078 (8th Cir. 2005)).  This claim requires Mr. Hassan to show "1) [he] belongs to a protected group; 2) [he] was subjected to unwelcome harassment based on [membership in that group]; 3) the harassment affected a term, condition, or privilege of [his] employment; 4) [his] employer knew or should have known of the harassment; and 5) the employer failed to take proper action." *Stewart v. Rise, Inc.*, 791 F.3d 849, 859 (8th Cir. 2015) (quotations omitted).  "To be actionable, [the] '. . . objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Clearwater*, 231 F.3d at 1128 (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998)).  Harassment is conduct that is so "extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.  "Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct. . . . Such claims are based on the cumulative effect of individual acts." *Cottrill v. MFA, Inc.*, 443 F.3d 629, 635 (8th Cir. 2006) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).  To successfully prove a hostile work environment claim, the work environment must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive." *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005)).  A plaintiff's allegations of discrimination based on a discrete event are "not broad enough to encompass hostile work environment claims." *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 838 (8th Cir. 2002).  In assessing the complained-of conduct, courts consider factors including the frequency and severity of

the allegedly discriminatory conduct, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005) (first citing *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003), and then citing *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002)).

As a matter of law, Mr. Kling's statements do not meet these rules. As far as the record shows, Mr. Kling's questions and statements were a discrete event. Mr. Hassan testified Mr. Kling made the statements in April or May 2021. ECF No. 75-1 at 47. Mr. Hassan's deposition testimony is not precise about whether Mr. Kling made his statements in a single conversation, or perhaps more than one. *See id.* at 41–49. Regardless, Mr. Hassan did not testify that Mr. Kling repeated his questions and comments or made similar statements frequently or on any other occasions. *See id.* Mr. Hassan does not allege, argue, or cite evidence tending to show that Mr. Kling's questions and statements affected or interfered with his work in any way. And it is difficult to understand how Amazon might have known about Mr. Kling's comments in a way that enabled it to take proper action. Crediting Mr. Hassan's deposition testimony that he told Ms. Alvarez about Mr. Kling's comments in March 2022, *id.* at 68–72, that is roughly three months after Mr. Kling ceased to be Mr. Hassan's direct manager in December 2021, ECF No. 72 ¶ 3. No evidence shows that Mr. Hassan worked with Mr. Kling after that. No reasonable jury could find that Mr. Kling's comments created a hostile work environment based on Mr. Hassan's race, color, or national origin.

B

Mr. Hassan asserts a Title VII retaliation claim and an MHRA reprisal claim. ECF No. 20 ¶¶ 90–101. "Title VII contains an antiretaliation provision that prohibits an employer from discriminating against an employee because the employee opposed a practice made unlawful by Title VII." *Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 983 (8th Cir. 2022); 42 U.S.C. § 2000e-3(a). Similarly, "[t]he MHRA forbids employers from retaliating when an employee opposes a practice forbidden by the MHRA." *Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 811 (8th Cir. 2018); Minn. Stat. § 363A.15. "Although the MHRA uses the term 'reprisal' rather than 'retaliation,' MHRA claims are analyzed in the same fashion as claims under Title VII." *Guimaraes v. SuperValu, Inc.*, No. 10-cv-366 (RHK/JSM), 2010 WL 5099648, at *11 (D. Minn. Dec. 8, 2010), *aff'd*, 674 F.3d 962 (8th Cir. 2012). For simplicity's sake, both claims will be referred to as "retaliation" claims here.

"To defeat summary judgment, [Mr. Hassan] must offer direct evidence of retaliation or create an inference of it under the *McDonnell Douglas* burden-shifting framework." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 804 (8th Cir. 2019). In his opposition brief, Mr. Hassan does not argue that direct evidence supports his retaliation claims; he relies on the *McDonnell-Douglas* framework, albeit without citing the case. *See* ECF No. 88 at 10. *McDonnell Douglas* will therefore be applied. *See Schottel*, 42 F.4th at 983 (applying *McDonnell Douglas* to a Title VII retaliation claim); *McLain v. Andersen Corp.*, 567 F.3d 956, 969 (8th Cir. 2009) (applying *McDonnell Douglas* to an MHRA reprisal claim). Under *McDonnell Douglas*, Mr. Hassan must

25

show: "(1) []he engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." *Mahler*, 931 F.3d at 805 (quoting *McDonnell Douglas*, 411 U.S. at 802).[15]  If Mr. Hassan makes this showing, then "the burden shifts to [Amazon] to articulate a legitimate, non-retaliatory reason for the adverse action." *Id.* "If [Amazon] does so, the burden shifts back to [Mr. Hassan] to demonstrate that [Amazon's] proffered reason is pretextual." *Id.*

In his opposition brief, Mr. Hassan describes his protected conduct as follows: "There is little dispute, Mr. Hassan made several complaints in early 2022 about the discriminatory treatment he experienced, including the offensive comments about his Somali background and religious practices."  ECF No. 88 at 10; *see id.* at 6 (explaining that Mr. Hassan's protected conduct occurred "in February of 2022" and was "complaints about the discrimination he suffered").  Though the opposition brief is not specific, the only complaints Mr. Hassan communicated around that time were to Ms. Alvarez regarding Mr. Kling's comments and the fact that employees who Mr. Hassan believed were "White American" had been promoted when he had not.  *See supra* at 5–6; *see also* ECF No. 75-1 at 68 (recording Mr. Hassan's testimony that he complained to Ms.

---

[15]     The "materially adverse" standard still applies to retaliation claims.  *See Muldrow*, 601 U.S. at 357.

Alvarez "sometime in March" 2022).[16]  The opposition brief identifies no other protected conduct.[17]

Mr. Hassan's opposition brief identified several assertedly adverse actions: (1) the lowering of Mr. Hassan's employee rating; (2) Mr. Sanchez's decision not to promote Mr. Hassan in Quarter 1 2022; (3) the failure to promote Mr. Hassan after that; (4) Mr. Sanchez's issuance of a written warning and the imposition of a performance-improvement plan; (5) denials of Mr. Hassan's leave requests; and (6) the termination of Mr. Hassan's employment.  *See* ECF No. 88 at 6–7, 11.[18]

---

[16]    Recall that, in his deposition, Mr. Hassan first testified that he also complained to Mr. Sanchez.  ECF No. 75-1 at 66–67.  But when asked further about it, Mr. Hassan remembered no conversation and asserted only that Mr. Sanchez must have been "aware" of Mr. Hassan's complaints "because managers, they share things, especially if you go to a skip level.  They'll definitely tell your direct manager."  *Id.* at 78.  Mr. Hassan, in other words, presumed that Ms. Alvarez shared Mr. Hassan's complaints with Mr. Sanchez.  Without more, this presumption is speculative and cannot be accepted as true.

[17]    To be clear, the opposition brief did not identify Mr. Hassan's EEOC complaint as relevant protected conduct.  The decision not to rely on the EEOC complaint as protected conduct makes sense considering the record.  It shows that no Amazon employee knew about the EEOC charge until after all adverse employment actions had ended, meaning the causation element of the prima facie case would be missing.  *See* ECF No. 68 ¶ 5; ECF No. 69 ¶ 7; ECF No. 70 ¶ 6; ECF No. 72 ¶ 4; ECF No. 73 ¶ 3; ECF No. 77 ¶ 19; *cf. Porter v. City of Lake Lotawana*, 651 F.3d 894, 898–99 (8th Cir. 2011) (concluding that "no reasonable jury could find that [plaintiff's] opposition to unlawful discrimination played any role in her discharge" when the decisionmakers provided sworn testimony they were unaware of the complaints and plaintiff submitted no controverting evidence).

[18]    Hostile-work-environment claims may include both discrimination and retaliation.  *See Mahler*, 931 F.3d at 807.  In his deposition, Mr. Hassan identified a series of actions he believed created a hostile work environment, perhaps in retaliation for his protected activity.  *See* ECF No. 75-1 at 107–114.  Regardless, the Amended Complaint cannot plausibly be understood to allege a hostile-work-environment claim arising from retaliation, *see generally* ECF No. 20, and Mr. Hassan does not identify or defend this

To show a causal relationship between his complaints to Ms. Alvarez and these actions, Mr. Hassan relies on just timing—*i.e.*, a temporal relationship between his protected activity and the several adverse actions he identifies. *Id.* at 11 (arguing that the adverse actions' "timing . . . provides strong evidence of a causal connection"). "Generally, something more than temporal proximity is required to establish the necessary causal connection." *Meinen v. Bi-State Dev. Agency*, 101 F.4th 947, 950 (8th Cir. 2024) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)). If a plaintiff "relies on mere temporal proximity . . . , the time between the protected activity and adverse action must be 'very close.'" *Id.* (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832–33 (8th Cir. 2002)); *see Schaefer v. Cargill Kitchen Sols., Inc.*, No. A16-0154, 2016 WL 6570240, at *9 (Minn. Ct. App. Nov. 7, 2016) ("Unless 'very close' in time, mere temporal proximity is not sufficient to create a genuine issue of fact regarding causation." (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001))). In *Schaefer*, the court favorably cited a case holding that a two-week period between protected activity and an adverse employment action was "barely" sufficient, *id.* (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)), and that periods of three weeks and twenty months were not, *id.* (citing *Clark Cnty. Sch. Dist*, 532 U.S. at 273–74, and *Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 697 (8th Cir. 2006)); *see also Fercello v. County of Ramsey*, 612 F.3d 1069, 1080 (8th Cir.

---

theory in his opposition brief, *see generally* ECF No. 88. If Mr. Hassan had advanced this theory, it would fail because the actions he identified cannot reasonably be considered hostile or pervasive; they are mine-run, everyday actions employers take with respect to their employees. *See* ECF No. 75-1 at 107–114.

2010) (finding that a nearly six-month gap "weakens the inference of causation and . . . eliminates [plaintiff's] ability to prove causation based on temporal proximity alone" (citation omitted)).

Considered against these rules, the temporal relationships between Mr. Hassan's protected activity in February or March 2022 and the adverse actions he identifies do not show causation as a matter of law. (1) Mr. Hassan does not identify who made the decision to lower his employee rating or when it occurred. *See* ECF No. 88 at 6. As support for this assertion, Mr. Hassan's opposition brief cites "Def. Memo. P.10 ¶ 3." *Id.* If this is intended to cite the tenth page of Amazon's opening brief, that page says nothing that might support an assertion regarding a drop in Mr. Hassan's employee rating. *See* ECF No. 66 at 17. Regardless, if Mr. Hassan wants to rely on the "timing" of adverse actions in comparison to his protected activity, ECF No. 88 at 11, then he has the burden to show when an adverse action occurred, *McDonnell Douglas*, 411 U.S. at 802. He has not met that burden with respect to this adverse action.[19] (2) It is difficult to understand how Mr. Sanchez's decision not to promote Mr. Hassan in Quarter 1 2022 could have been taken in retaliation for Mr. Hassan's protected activity. That decision pre-dated Mr. Hassan's complaints to Ms. Alvarez. *See* ECF No. 75-1 at 67 (describing protected activity as having occurred "shortly after" learning he would not be promoted in Quarter 1 2022). And Mr. Hassan's protected activity involved complaining about the

---

[19]    In its reply brief, Amazon says the rating drop occurred "in Q1 2023." ECF No. 91 at 5, 8. If true, that is more than nine months after Mr. Hassan's protected activity, and that is too long to show a trial-worthy causation question.

decision not to promote him during Quarter 1 2022. *See id.* at 67–76.  (3) Mr. Hassan does not identify the timing of his post-Quarter 1 2022 non-promotions, either by reference to when affirmative decisions may have been made not to promote him or when he might have been considered for a promotion but was not.  Again, without this evidence, Mr. Hassan cannot carry his burden to show a temporal relationship between these adverse actions and his protected activity.  (4) Mr. Sanchez issued the written warning to Mr. Hassan on June 21, 2022. *Id.* at 134.  At the soonest, that is roughly three months after Mr. Hassan's protected activity, too long to create a submissible fact question regarding causation.  The temporal gap between the performance-improvement plan's imposition and Mr. Hassan's protected activity is greater still.   The performance-improvement plan was created in November 2022.  ECF No. 95-2 at 9. (5) From there, the temporal gaps just get longer.  The only record evidence regarding Mr. Hassan's assertion that he was denied leave requests shows a denial occurring in January 2023.  ECF No. 90-5.  (6) And Mr. Hassan's employment was terminated in February 2023.  ECF No. 77 ¶ 18.  These periods are too long to enable a reasonable juror to causally connect these actions with Mr. Hassan's exercise of protected activity.

The parties dispute whether, had Mr. Hassan made a prima facie case of retaliation, his termination was legitimate and non-pretextual.  Amazon terminated Mr. Hassan "for committing expense fraud in violation of" Amazon policies.  ECF No. 77 ¶ 16.  Based on Mr. Lewis's investigation, Amazon determined that Mr. Hassan had purchased Apple AirPods with his personal credit card without authorization, submitted the purchase as a business expense, and later returned the headphones for cash. *Id.*; ECF

No. 69-1 at 6.  Although Mr. Hassan denied expensing the AirPods and claimed to have instead purchased an Amazon-approved headset, the receipt Mr. Hassan provided to substantiate the purchase was not itemized, and Amazon's forensic investigation showed that Mr. Hassan purchased AirPods on the date of the receipt and did not purchase an Amazon-authorized headset that day.  ECF No. 69-1 at 6.

To show this reason was pretextual, Mr. Hassan "must both discredit the asserted reason for the adverse action and show the circumstances permit drawing a reasonable inference that the real reason for the adverse action was retaliation."  *Scarborough v. Federated Mut. Ins. Co.*, 996 F.3d 499, 506 (8th Cir. 2021) (cleaned up).  "In determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred."  *Mervine v. Plant Eng'g Servs., LLC*, 859 F.3d 519, 527 (8th Cir. 2017) (quoting *Macias Soto v. Core-Mark Int'l, Inc.*, 521 F.3d 837, 842 (8th Cir. 2008)).

Mr. Hassan has not made this showing.  On this question, Mr. Hassan argues only that he "had obtained approval for the purchase through Amazon's internal messaging system."  ECF No. 88 at 12.  The source for this assertion is a post-discovery declaration of Mr. Hassan filed only in connection with Amazon's summary-judgment motion.  ECF No. 89.  If Mr. Hassan's declaration testimony is intended to mean he had permission to purchase and expense Apple AirPods, it is not consistent with what he told Mr. Lewis or his deposition testimony.  In response to Mr. Lewis's questioning, Mr. Hassan denied expensing the AirPods, ECF No. 69-1 at 6, and Mr. Hassan confirmed this denial in his

deposition, ECF No. 95-1 at 7.  Mr. Hassan has not raised a genuine fact dispute regarding the legitimacy of this stated reason for Mr. Hassan's termination.

### ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Defendant Amazon Services, LLC's Motion for Summary Judgment [ECF No. 64] is **GRANTED**.

2.    Plaintiff Ahmed Hassan's Amended Complaint [ECF No. 20] is **DISMISSED WITH PREJUDICE**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February 24, 2025                          s/ Eric C. Tostrud
                                                                Eric C. Tostrud
                                                                United States District Court